Paul GARRETT, Plaintiff–Appellant,

v.

Thomas V. BARNES, individually and as Mayor of the City of Gary, Indiana, and the City of Gary, Indiana, an Indiana municipal corporation, Defendants–Appellees.

No. 91–1505.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 4, 1991.

Decided April 8, 1992.

Robert G. Berger, Highland, Ind. (argued), for plaintiff-appellant.

Gilbert King, Jr., Corp. Counsel (argued), Office of Corp. Counsel, MacArthur Drake (argued), Gary, Ind., for defendants-appellees.

Before MANION and KANNE, Circuit Judges, and WILL, Senior District Judge.*

WILL, Senior District Judge.

Paul Garrett sued Mayor Barnes and the City of Gary under § 1983, charging that he had been fired because of his political affiliation with the previous mayor in violation of his first amendment rights. At the

* The Honorable Hubert L. Will, Senior Judge of the United States District Court for the Northern District of Illinois, Eastern Division, is sitting by designation.

close of evidence in the third trial (two earlier mistrials had resulted from hung juries), the district court granted the defendants' motion for a directed verdict. This appeal followed.

## I. Facts

On review of a directed verdict we examine the facts, and all inferences that they reasonably support, in the light most favorable to the non-moving party, in this case Garrett.

Garrett was hired by the city of Gary in 1981 as a grants coordinator. At that time Richard Hatcher was mayor of Gary. Garrett's job was to prepare and revise grant applications, identify funds, and develop a system for reporting and coordinating grants submitted by various departments, as well as to perform any other duties assigned to him. Garrett was assigned research projects as well as grants work, and in 1984 when the Department of Research Monitoring and Analysis was created Garrett was assigned to that department. At this point he used the title "Research Analyst" and a job review from 1985 used this title ("grants coordinator/research analyst"), although his title was not formally changed.

When Garrett was hired he had not been active in politics, but he later became a precinct captain for the Democratic Party in his district. He was also a member of the Young Democrats, where he met Mr. Barnes' son. Garrett testified that he visited Barnes' home in the early 1980's when Barnes was running for re-election for Assessor. Garrett and Barnes were also members of the same fraternity.

In 1987 Garrett was a candidate for the Democratic nomination for councilman from his district (all Gary officials are Democrats). In the same election Barnes challenged Hatcher for the Democratic nomination for mayor. Mayor Hatcher endorsed Garrett for the councilman nomination. Although he does not remember whether he did so publicly, the jury could certainly infer that the endorsement was made public somehow, and that Barnes knew of it, although he testified at trial

that he did not remember it. Garrett, in turn, endorsed Mayor Hatcher for re-election. The jury could also infer that Barnes was aware of this endorsement, although he testified that he did not recall it. Despite these mutual endorsements, both candidates lost. Mayor Barnes beat Hatcher for the Democratic nomination for mayor, and won the general election that fall. Garrett came in second in his council race.

During the campaign, Barnes sent a letter to all city employees, including Garrett. In addition to a general campaign pitch, the letter acknowledged everyone's concerns about jobs, and, citing *Elrod v. Burns*, informed all employees that they could not be fired for political reasons as long as they were performing satisfactorily. Following the primary, Barnes sent letters to all the candidates—one for the winners, one for the losers. Garrett received such a letter, telling him he ran a good campaign, he shouldn't lose heart, and so on.

Barnes testified that he sent these letters to everyone, and he did not have any other personal communication with Garrett during this period. Barnes said that he was not aware of the endorsements or Garrett's political associations. Barnes also testified that he campaigned actively, meeting most politically active people.

There was sketchy evidence of Garrett's job performance. His personnel file contained only two evaluations—from 1984 and 1985. These evaluations were good: he was given 94 and 96 points out of 100 possible. Ms. Nelson, the director of the Division of Community Services also testified as to Garrett's job performance. Garrett was not in her division, but he did do some research for her division, and worked on a few projects with her. She testified that the work she observed him do was satisfactory. The former deputy mayor, Mr. Holland, testified that when Garrett was hired he worked under his supervision, until Garrett's transfer to the research department in 1984 or 1985. Holland testified that Garrett was a satisfactory employee. The evidence at trial also showed that Garrett had produced only two grants during his entire period of employment,

totalling $11,000 in funds to the city. According to Barnes he was not aware that Garrett had brought in *any* grant money until the trial produced evidence of two grants. Garrett argues that Mayor Barnes did not know how many grants he generated until the trial.

After Barnes was elected and prior to taking office he prepared for the transition of administrations with the help of consultants. There were many studies done of the city administration and changes were suggested. Barnes was supposed to produce any recommendations made about the Department of Research and Monitoring where Garrett was employed, but he was unable to find any. Barnes testified that he did not preserve all of the papers from the transition.

Barnes testified that he decided to reorganize the Department of Research and Monitoring. There had been four positions, one of which was vacant. He said that he made the risk manager position full-time, and hired a professional for the position, dismissing a state representative who had worked in that position for 9 months per year, and canceling contracts with an outside group that was hired to perform the work that the previous office holder had been unqualified to do. The position of affirmative action officer was terminated and the duties transferred to another department. Barnes also testified that he decided to eliminate the grants coordinator position because he did not think any grants were being produced through that position, and that it would be more effective for each department to apply for its own grants (Tr. 377). Thus, a total of three people were terminated—two because their positions were eliminated, and one because of a change in the job requirements which he could not satisfy. There was no evidence about the political associations of the other two terminated employees. The position of director had been vacant, and the position of risk manager was changed. A third position was also created, although there was no testimony about what it was. Thus, in the year following Barnes' election, three people were hired in this department.

Barnes sent Garrett a letter dated December 29, 1987 informing him that the department was being restructured and his position was terminated effective January 1, 1988. Garrett received this letter on January 4, 1988. In the restructured department, Barnes hired three new employees to fill the changed positions. He testified that he knew two of the new employees, that they had worked with him previously, and that they had supported him in the mayoral primary. The third new employee was promoted from a previous position in the Hatcher administration.

Garrett's interpretation of this evidence is that Barnes fired him because he had supported Hatcher. Garrett suggests either that the re-organization did not even occur, or that it did, but was politically motivated. Barnes argues that he had legitimate reasons to re-organize the department and terminate Garrett, and denies any political motivation.

## II. Standard of Review

Both directed verdicts and judgments notwithstanding the verdict are governed by FRCP 50 "Judgment as a Matter of Law," which states that:

> If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim, counterclaim, cross-claim, or third party claim that cannot under the controlling law be maintained without a favorable finding on that issue.

This circuit has held that application of Rule 50 means that:

> A judgment n.o.v. [or directed verdict] should be denied " 'where the evidence, along with the inferences to be reasonably drawn therefrom, when viewed in the light most favorable to the party opposing such motion is such that reasonable men in a fair and impartial exercise of their judgment may reach different conclusions.' " [citations omitted]

Implicit in this standard is a recognition that a jury verdict must be allowed to stand if it is supported by circumstantial evidence. A judgment n.o.v. [or directed verdict] is proper, however, if the verdict is supported only by "sheer speculation and conjecture." [citation omitted]

*McClure v. Cywinski,* 686 F.2d 541, 544 (7th Cir.1982). Another formulation is that:

[T]he trial judge must determine whether the party with the burden of proof has produced sufficient evidence upon which a jury could properly proceed to a verdict, and ... a mere scintilla of evidence will not suffice.

*Richardson v. Indianapolis,* 658 F.2d 494, 498 (7th Cir.1981), *cert. den.,* 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982). We review directed verdicts *de novo. Hayes v. Otis Elevator Co.,* 946 F.2d 1272, 1275 (7th Cir.1991).

■ It was suggested at oral argument both that the two previous trials, in which a directed verdict was denied and the jury hung, weigh in favor of and that they weigh against the directed verdict that was ultimately granted. The plaintiff argues that the denial of previous motions for a directed verdict demonstrates that there was sufficient evidence for the case to go to the jury. However, following this logic, we would never be able to uphold a judgment notwithstanding the verdict when a motion for directed verdict had previously been denied, because the standards are the same. This is illogical. Judges often deny a directed verdict, waiting to see if the jury will arrive at a supportable verdict before they enter a j.n.o.v. This is a similar situation, except that the verdict was not entered until after two attempts to get a jury verdict. The plaintiff assumes that if the judge changes his mind, he must be wrong now. However, it is equally possible that the judge was right to grant the directed verdict and wrong to deny the motion earlier. Conversely, the defendants argue that

the two hung juries suggest that, legal issues aside, a reasonable jury practically *cannot* reach a verdict for the plaintiff— they have tried twice and been unable to. Of course, the two juries were equally unable to reach a verdict for the defendants, and a sample of two particular juries hardly dictates what a reasonable jury *may* do.

III. Requirements for a prima facie case of politically motivated discharge

■ In order to show a violation of his first amendment rights, Garrett had to prove by a preponderance of the evidence that his conduct was constitutionally protected, and that the protected conduct was a substantial factor in the decision to terminate him. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Endicott v. Huddleston,* 644 F.2d 1208, 1215 (7th Cir.1980); *McClure,* 686 F.2d at 545. There is no dispute that Garrett's endorsement of and support for Mayor Hatcher's campaign is protected by the first amendment, the question is whether Barnes was motivated, at least in part, by that conduct to fire him. If Garrett meets this burden, the burden then shifts to Barnes to prove by a preponderance of the evidence that Garrett would have been terminated even without political considerations. *Mt. Healthy, Endicott, McClure supra.*

In order to prove that Barnes was motivated by his political associations, Garrett must first prove that Barnes in fact knew of them. *Cusson–Cobb v. O'Lessker,* 953 F.2d 1079 (7th Cir.1992). While Barnes testified that he does not recall or was not aware of Garrett's support for Hatcher, there was sufficient evidence of Garrett's public activities so that the jury could find that Barnes was aware of Garrett's endorsement of Hatcher.

Garrett has no direct evidence to support his contention that Barnes' termination of his position was politically motivated.[1] He

---

**1.** While such direct evidence is not absolutely necessary, it is much more common than one would expect. While employers are generally aware enough of potential liability not to tell

employees that they are being fired because of their race or sex, there are several reported cases in which employees were told outright that they were losing their jobs because they

tries to make his case based on his version of the facts that he was performing his job satisfactorily, that he supported a different candidate, that the successful candidate fired him and two others, and that two supporters were hired. Facts suggesting that a qualified person of one type was fired, and a person of another type was hired make out a prima facie case of race or sex discrimination, but they do not suffice to show discrimination based on political association.

■ Garrett could be fired for a good reason or for no reason at all, as long as he was not fired because of his constitutionally protected activities. *Perry v. Sinderman*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Elrod v. Burns*, 427 U.S. 347, 361, 96 S.Ct. 2673, 2683–84, 49 L.Ed.2d 547 (1976); *Mt. Healthy*, 429 U.S. at 283, 97 S.Ct. at 574. Barnes does not have to prove a legitimate reason for firing Garrett until Garrett has come forth with sufficient evidence to support a prima facie case of political motivation. Garrett's contention that he was performing his job satisfactorily, even if true, does not prove that the motive for his firing was political.

Several Seventh Circuit opinions reviewing the quantity of evidence that is necessary to make out a prima facie case of political motivation form a backdrop for our consideration of Garrett's case. In *Endicott v. Huddleston*, 644 F.2d 1208, 1215 (7th Cir.1980) the court upheld the grant of j.n.o.v., saying:

> In the instant case, all Endicott has shown is that he is a Democrat and that the defendants are Republicans, that there were numerous conflicts between himself and the Board, and that as early as 1972 two of the defendant Board members wished to remove him from office. Even drawing all reasonable inferences from the evidence viewed in the light most favorable to plaintiff, we conclude there was insufficient evidence from which a jury could find that the defendants' actions were motivated by political considerations.

In this case Garrett and Barnes are of the same party, but supported different candidates. There is little difference in the amount of evidence.

In *Nekolny v. Painter*, 653 F.2d 1164 (7th Cir.1981), *cert. den.*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982) the court upheld the jury verdict that the firing was politically motivated in a case in which the defendant's assistant told the plaintiffs that the defendant wanted to fire them because they had worked against the defendant in the election. The court noted that the plaintiffs had the burden of showing that the firing was substantially motivated by politics, not an insignificant burden:

> A disgruntled employee fired for legitimate reasons would not be able to satisfy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election.

*Id.* at 1168. That is essentially what happened in this case—Garrett endorsed Barnes' opponent. No matter how much work Garrett did for Hatcher, or how useful his endorsement was, Garrett would still lack any evidence that Barnes was motivated by these actions to terminate him.

In *McClure v. Cywinski*, 686 F.2d 541 (7th Cir.1982), the court upheld a grant of j.n.o.v. The court held that the plaintiff had not produced sufficient evidence of political motivation, and that even if he had, the defendants had substantial evidence that they would have fired him anyway. In that case the plaintiff had explicitly said he didn't want to be politically active, although others on the job were. He overheard a fellow employee saying, "Makos is okay. She's a senator's friend. McClure is just window dressing. We'll get rid of him later." *McClure*, 686 F.2d at 543. The court found the connection with the plaintiff's firing tenuous because the conversation occurred a few months earlier. In addition to the overheard comment there

---

supported the wrong candidate. See for example, *Nekolny v. Painter,* 653 F.2d 1164 (7th Cir.

1981) and *Kurowski v. Krajewski,* 848 F.2d 767 (7th Cir.1988).

was other evidence of politically motivated activities, yet the court said:

[W]e think the above pattern of events is at most sufficient only to create an inference that Cywinski preferred working with employees who were politically motivated. Whether Cywinski would have *discharged* McClure because of his apolitical attitude is another question.

*Id.* at 546.

However, sufficient evidence has been found to show a political motivation in cases such as *Gannon v. Daley*, 561 F.Supp. 1377 (N.D.Ill.1983), where the plaintiffs were told that they weren't fired for disciplinary reasons, but because the defendants were allowed to put in their own people, and where their personnel files noted that they had been terminated due to a change in administration, not poor performance.

The least amount of evidence to survive a summary judgment motion was in the case of *Rateree v. Rockett*, 670 F.Supp. 787 (N.D.Ill.1987). The plaintiffs had evidence that only their jobs were cut from the budget: the city council outvoted the mayor's supporters and eliminated those four jobs only, by title. When three of the plaintiffs were hired in different positions, the city council again cut precisely those three positions in the following year's budget. Finally, the defendants called the plaintiffs the mayor's "four mascots," and indicated displeasure with their support for the mayor. In this case we have not even one remark suggesting that Mayor Barnes was upset over Garrett's political connections with the outgoing mayor.

■ Garrett has not produced anywhere near the level of evidence as other plaintiffs whose cases were dismissed on directed verdicts or j.n.o.v. He has produced no direct evidence and virtually no circumstantial evidence. Garrett is trying to make his case on a nod, a wink, and the suggestion that *"we* know what those politicians are like ... they'd re-organize a department to get rid of someone who voted the wrong way." It may be easy to become cynical about politics and politicians, but public perception of political machinations, innu-

endo, and speculation cannot be the basis of a jury verdict—and there is nothing else in this case.

Even if Barnes had the burden of proving a legitimate reason to terminate Garrett, he presented uncontradicted evidence of the re-organization of the Department of Research and Monitoring, which would provide such a legitimate reason. Barnes' testimony explained the change in one position and the elimination of two others, including the grants coordinator position held by Garrett. Barnes had a good explanation for the elimination of that position—to the best of his knowledge the position of grants coordinator had not helped the city obtain any additional funds. It was only at trial, agrees Garrett, that Barnes learned that two grants—totalling only $11,000— had been produced. Garrett argues that his job responsibilities had changed, so that the lack of grants is irrelevant. However, the only evidence presented on the re-organization suggests that Barnes knew the job titles and formal structure, but did not have any details about Garrett's work. A re-organization is a legitimate reason to terminate someone who is performing satisfactorily. *Misek v. City of Chicago*, 783 F.2d 98 (7th Cir.1986). However, the plaintiff can challenge the legitimacy of the re-organization.

Garrett has presented two challenges to the re-organization of the Department of Research and Monitoring. First, he suggests that it did not occur. Second, he argues that if it did occur, it was politically motivated. Garrett did not present the slightest shred of evidence to suggest the re-organization did not occur. While it is true that the jury did not have to believe Barnes' description of the re-organization, Garrett had to put forth some evidence to support his view that no re-organization occurred. Garrett's only support for this view is his argument that no re-organization can legally occur unless the Mayor gets approval from the city council. Garrett bases his argument on Indiana Code 36–4–5–3 and 36–4–9–4. The district court declined to take judicial notice of 36–4–9–4 until Garrett could lay a proper foundation

for its connection to the case. There is nothing in 36–4–5–3, a general statement of the mayor's powers and duties, which requires city council approval before a department is re-organized. There is also no reason to find 36–4–9–4 applicable: the ordinance provides for city council approval of the creation and termination of a department, but does not address re-organizations in which a single position within the department is changed or terminated. Thus there is absolutely nothing in the record to support Garrett's contention that no re-organization took place. Garrett's second argument, that the re-organization which took place was politically motivated, is equally unsupported. Garrett can no more base this argument on speculation than he can his argument that his own termination was politically motivated.

No reasonable jury could find that Garrett has met his burden of proving that Barnes fired him because of political associations. Any such verdict would be based on speculation. The judgment of the district court is, therefore, affirmed.