Lawrence H. **PAYTON**, Plaintiff,

v.

Marvin T. **RUNYON**, Postmaster General, United States Postal Service, Defendant.

No. IP 95–552–C–B/S.

United States District Court, S.D. Indiana, Indianapolis, Division.

Dec. 4, 1997.

**623**

for nineteen years until he was terminated on March 27, 1992. Defendant, Marvin T. Runyon, Postmaster General of the United States Postal Service (Postal Service), moves for summary judgment as to Plaintiff's claims that his termination was in violation of the Rehabilitation Act of 1973, the First Amendment and Indiana public policy. For the reasons set forth herein, Defendant's motion for summary judgment is *granted.*

### Statement of Facts

For nineteen years, Plaintiff was a letter carrier for the United States Postal Service. He did his job well and was a valued employee at the Speedway Post Office. Payton Dep. at 33. Unfortunately, in 1984, Payton injured his back and, thus, had limited functional ability to perform his job. In July 1991, Payton ruptured a tendon in his left arm while lifting a mail tray and eventually required surgery to repair his injury. Although there was some initial dispute about whether Payton's injury was "on the job" (and, thus, whether Payton was entitled to worker's compensation), the Department of Labor eventually approved Payton's claim for injury for his ruptured tendon. Defendant's Ex. 4.

About the same time that Plaintiff's arm was injured and operated upon, Payton's child support obligations were increased about 76% (Payton has three children for whom he is obligated to pay support). Payton Dep. at 16–17, 173. As a result of the financial strain, Payton became depressed and required increasingly potent anti-depressant medication. Payton Dep. at 173.

In November 1991 in Royal Oak Michigan, a disgruntled former Postal Service employee walked into the Post Office and shot and killed four employees (including a supervisor) and injured five other postal employees. Defendant's Ex. 9. When the local television network affiliates went to the Speedway Post Office to interview employees about their views on the Michigan events, Payton told them that one of the shooting victims, a former foreman in the Indianapolis office, was "probably the most obnoxious human being that I had ever had the misfortune of

W. Russell Sipes, Laudig George Rutherford & Sipes, Indianapolis, IN, for Plaintiff.

Tim A. Baker, Assistant U.S. Attorney, Office of United States Attorney, Indianapolis, IN, for Defendant.

### ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BARKER, Chief Judge.

Plaintiff, Lawrence H. Payton (Payton), is a former United States Postal Service employee. He worked for the Postal Service

being around." Payton Dep. at 97. Apparently, many of the Speedway employees shared this view: it was reported that a cheer went up when the news of the former supervisor's death reached the Speedway Post Office. *See* Payton Dep. at 112 (video of news broadcast). After the broadcast of Payton's interview, the office supervisor, William Ruona (Ruona) instructed a group of the office employees that they were not to speak to the media about the Royal Oak incident. Payton's Dep. at 119. Ruona did not address Payton personally during this meeting; he directed his comments to all of the employees assembled. Payton's Dep. at 119–20.

Following the Royal Oaks shooting, Payton's live-in companion (and fellow Postal Service employee) Deborah Wilson (Wilson) sent dead flowers to a Postal Service Manager as a "practical joke." Payton's Dep. at 139. After Wilson sent the flowers, the Manager's wife received a phone call from an unidentified male stating that her husband was on administrative leave because the flowers sent to him contained a bomb. Payton's Dep. at 143.

Payton maintains that he had nothing to do with the "dead-flower" incident and did not even know about it until days later. Payton Dep. at 139. Postal Inspector P.M. Sheehan (Sheehan) investigated the incident and, at one point during the investigation, Payton was present when Sheehan gave Wilson a *Miranda* warning. This was done in front of all of Wilson's co-workers, and, afterwards, Payton told Sheehan he was a "neo-Nazi" because of his approach to the investigation. As a result of Sheehan's investigation, Wilson was suspended for two weeks. Payton's Dep. at 141–42.

The Postal Service maintains that, following Wilson's suspension, several employees told Ruona that Payton had threatened his life and others as well. Ruona reported these threats to Sheehan and, according to the Postal Service, confirmed the co-workers' reports to Ruona. Ruona Dep. at 58–67.

During this time, Payton had been on temporary limited duty because of his ruptured tendon. Payton was released from temporary limited duty effective January 17, 1992. Nevertheless, Payton's arm was still causing him trouble and he did not feel that he could perform his job. Payton's Dep. at 147. Payton, Ruona and Union Steward Charlie Louden met and agreed that Payton could gradually return to full-time work so that he would not re-injure his arm. Ruona Dep. at 71.

A few days after returning to work, Payton told his supervisor, Steve Gadson (Gadson), that he wanted counseling through the Postal Service's Employee Assistance Program (EAP). Payton's Dep. at 146–47. Plaintiff had already been taking Prozac for mental depression. Payton's Dep. at 148. Gadson arranged for Payton to meet with an EAP counselor (a medical doctor), who changed Payton's medication to Xanax. Payton's Dep. at 146–48; Ruona Dep. at 72. Plaintiff did not return to work for several days after his meeting with the EAP counselor. Ruona Dep. at 72–73.

When Payton did return to work, Gadson told Ruona he was concerned about Payton. Ruona Dep. at 73. Ruona, Gadson and Louden met with Payton to ask him where he had been and whether he was on any medication. Ruona Dep. at 73. Payton told them that he had gone to see the EAP counselor and requested that the doctor put him in a mental institution, but that the doctor refused. Ruona Dep. at 73. Payton also told them that the doctor had changed his medication and that, because of the new medicine, he felt he could not drive. Ruona Dep. at 73–74. Accordingly, Ruona determined that Payton should not drive his postal route at that time. Ruona Dep. at 75.

After the meeting, Ruona contacted his supervisor, who in turn contacted the Postal Service's doctor and Postal Inspector Sheehan. The Postal Service doctor and Sheehan then met with Payton and Louden. The doctor determined that Payton was either being incorrectly medicated or overmedicated. Ruona Dep. at 74. Payton then suggested that he take off the rest of the morning because he had another doctor's appointment later that morning. Ruona Dep. at 74–75. Ruona agreed and arranged for another employee to drive Payton to his doctor's appointment. Ruona Dep. at 75.

The following day, Ruona maintains that more Postal Service employees told him they had heard additional death threats from Payton. Ruona contends that one letter carrier told him that she felt "very unsafe in the office due to Mr. Payton and his medication that he was on." Ruona Dep. at 77–78.

On either January 23 or 24, Ruona received a telephone call from the Director of City Operations for Postal Services. He told Ruona to leave immediately the Speedway Office and to come to the main post office. Ruona Dep. at 78–79. At the Main Post Office, Martin told Ruona that Payton had made another death threat against him and that, to ensure his safety, "they were temporarily pulling [him] out of the [Speedway] office." Ruona Dep. at 79.

The Postal Service maintains that Payton had placed a telephone call to Eunice Ford, the Postal Service's injury compensation supervisor, to discuss expediting his injury compensation claim. Ford Dep. at 6, 59–60. During the conversation, Ford maintains Payton told her that she should be glad not to know Ruona because he is a "dirty SOB and deserves to be killed." Ford Dep. at 62. Ford also contends that Payton told her that all of his guns had been taken away in order to prevent him from killing Ruona. Ford Dep. at 62; *see also* Defendant's Ex. 12. In a letter to Inspector Sheehan following the telephone call, Ford recounted Payton's statements to her, including the following reference to the Royal Oak tragedy:

> Larry [Payton] stated that being released back to full duty was another thing that was bothering him along with Bill Ruona. He stated that he would not be like the man from Royal Oak who went into the Post Office and killed a bunch of people and then turned the gun on himself. He said he would do the killing then turn himself in and go to Central State Hospital (or Larue center) for a couple of years and make baskets. After his two years was up he [sic] get out and be okay.

Defendant's Ex. 12; *see also* Ford Dep. at 63–65. Ford testified in her deposition that she was "very scared" by the telephone call, regarded it as a direct threat against Ruona and, thus, reported the call to her supervisor.

Ford Dep. at 56, 64, 69, 78. It was the report of this threat which caused the Postal Service's Director of Operations to call and direct Ruona to leave immediately the Speedway office. Payton denies ever speaking with Eunice Ford, and he vehemently denies having ever threatened Ruona's life. Payton Dep. at 65, 159–62.

On January 28, 1992, Ruona obtained a temporary protective order prohibiting Payton from threatening him, his family or his property. Payton's Dep. at 167; Defendant's Ex. 13. On February 11, 1992, a hearing was held on Ruona's application for a permanent protective order. Payton (and his attorney) participated in this hearing, which resulted in a Marion County court issuing a permanent restraining order. Payton's Dep. at 168–69; Defendant's Ex. 14.

Postal Inspector Sheehan investigated the allegations of Payton's threats against Ruona. Ruona Dep. at 60–61. Sheehan prepared an investigative memorandum regarding his findings and, on February 12, 1992, Gadson called Payton to schedule a meeting to review Sheehan's report. Payton's Dep. at 180–81; Defendant's Ex. 15. During this phone call, Payton told Gadson that he "would like to get behind the U.S.P.S. and do some serious ass kicking." Payton's Dep. at 181–82. Apparently referring to Ruona and the restraining order, Payton said that "that dumbass" dragged him into court and cost him about one hundred dollars. Defendant's Ex. 15.

Payton did not show up for the meeting with Gadson. Payton's Dep. at 182; Defendant's Ex. 15. In his deposition, he stated that he did not attend the meeting because his attorney could not be present, but he concedes that he did not have the right to have an attorney at this meeting. In addition, Payton was aware that Gadson had scheduled union steward Louden to be present at the meeting on behalf of Payton. Payton's Dep. at 182–84; Defendant's Ex. 15.

In a letter to Payton dated February 20, 1992, the Postal Service informed Payton that he was being placed on off-duty status effective February 21, 1992 because of his death threats against Ruona. Defendant's

Ex. 16. The Postal Service simultaneously also informed him that, because of his threats against Ruona, he would be terminated effective March 27, 1992. Defendant's Ex. 17.

## DISCUSSION

### A. Summary Judgment Standards

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Pro. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the non-moving party on the particular issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Methodist Med'l Ctr. v. American Med'l Sec., Inc., 38 F.3d 316, 319 (7th Cir.1994).

On a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving partys case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. Celotex, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. Spraying Sys. Co. v. Delavan, Inc., 975 F.2d 387, 392 (7th Cir.1992). Thus, if genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. Shields Enters., Inc. v. First Chicago Corp., 975

F.2d 1290, 1294 (7th Cir.1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).

Nevertheless, only issues of fact that could affect the outcome of a case are "genuine" such that they may save a case from summary judgment. Anderson, 477 U.S. at 248, 106 S.Ct. at 2510; Tolle v. Carroll Touch, Inc., 23 F.3d 174, 178 (7th Cir.1994). Thus, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but also required. Celotex, 477 U.S. at 322, 106 S.Ct. at 2552; Herman v. City of Chicago, 870 F.2d 400, 404 (7th Cir.1989).

### B. Rehabilitation Act of 1973

■ Plaintiff maintains that he was fired in violation of Sections 501 and 504 of the Rehabilitation Act of 1973. The Rehabilitation Act of 1973 is almost identical to the Americans with Disabilities Act and, accordingly, is analyzed using the familiar test set forth in the Supreme Court decision, McDonnell Douglas Corporation v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[1] See Rothman v. Emory Univ., 123 F.3d 446, 451 (7th Cir.1997).

■ At the time of his termination, Plaintiff was arguably disabled in three ways: one, because of his back injury; two, because of his arm injury; and three, because of his mental illness. We need not pinpoint precisely on the basis of which disability Payton believes himself to have been terminated (and whether Payton can establish a prima facie case of discrimination), because the Postal Service has produced a legitimate nondiscriminatory reason for terminating Payton and there is simply no evidence of pretext. See, e.g., Equal Employment Opportunity Commission v. Our Lady of the Resurrection Medical Center, 77 F.3d 145, 150 (7th Cir. 1996) (stating that "[t]o expedite the process it may be preferable to get past the prima facie case and examine the pertinent issue of

---

**1.** Neither the Postal Service nor Plaintiff addresses whether Rehabilitation Act Section 504 properly applies to the claims at bar. The Seventh Circuit has implied that it does not. See Johnson v. Runyon, 47 F.3d 911, 916 n. 5 (7th Cir.1995) ("it is doubtful that 'Section 504 applies to employment discrimination suits against

federal agencies.' ") (quoting McWright v. Alexander, 982 F.2d 222, 225 (7th Cir.1992)). This is of no moment, however, as the analysis of Sections 501 and 504 claims is the same (see 29 U.S.C. § 791(g) and 29 U.S.C. § 794(d)) and, accordingly, Plaintiff's claims fail under both sections.

whether there was discrimination in a job action.").[2]

The Postal Service fired Payton because it believed that he made death threats targeting his Postal Service supervisor, Ruona. Plaintiff maintains that the Postal Service created the excuse of death threats as a pretext to fire him because he was disabled. In support of this argument, Plaintiff points to the affidavits of his coworkers, Steve Doyle, Charlie Louden, Dick Bush, Garry Britt and Pat Rork. These postal employees were the ones Ruona maintains reported to him that Payton was making threats against him. *See* Ruona Dep. at 58–67. Payton argues that his coworkers' affidavits demonstrate that they never made such statements to Ruona and that "Ruona's testimony is all lies." For example, Steve Doyle's affidavit states:

> At no time was I afraid for my life at speedway post office. Because of Larry Payton. [sic] At no Time [sic] did I hear Larry Payton directly threaten Bill Ruona.

Plaintiff's Ex. 5. Charlie Louden attests, "I *never* appoached [sic] Bill Ruona conserning [sic] death threats from Larry Payton." Plaintiff's Ex. 6 (emphasis in original). Dick Bush's affidavit states:

> I was never afraid for anyones [sic] life while work at Speedway with Larry Payton.
>
> I never heard Larry Payton threaten anyone with physical violance [sic] or make any death threats.

Plaintiff's Ex. 7. Pat Rork attests, "I never went to Ruona concerning Mr. Payton, any statements made are untrue. I never felt threatened." Plaintiff's Ex. 8. Finally, Garry Britt's affidavit states, "I do not ever recall having any conversation about Larry Payton with Bill Rona [sic]. Also I never felt threatened by Larry Payton." Plaintiff's Ex. 9.

Notably, the affiants merely state that they did not personally feel threatened by Plaintiff, did not hear Payton directly threaten Ruona and did not approach Mr. Ruona. Other than Mr. Bush, none of the affiants testifies that (s)he did not hear Payton make death threats against Ruona or did not have a conversation with Ruona (Mr. Britt cannot "recall" having a conversation with Ruona; he does not say he did not). Yet, even if the Court were to believe that, taken as a whole and favorably construed, these affidavits created issues of fact regarding Ruona's genuine belief that Payton had threatened his life, Plaintiff's evidence still cannot undermine the Postal Service's legitimate, nondiscriminatory reason for firing Payton. Eunice Ford, the Postal Service's injury compensation supervisor, testified that she believed Payton threatened Ruona's life and that she reported it to her supervisor. Payton is adamant that he did not speak with Ford, yet even if she was mistaken, and it was not Payton with whom she spoke, a mistake is not the same thing as discrimination. *Cf. Kralman v. Illinois Dep't of Veterans' Affairs*, 23 F.3d 150, 157 (7th Cir.1994) (em-

---

**2.** The Seventh Circuit has recently held that to establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must show: (1) that his condition is a disability as defined under the Act; (2) that he was otherwise qualified to perform his job; (3) that he was employed by a federal agency; and (4) that he was terminated or otherwise discriminated against solely because of his disability. *Rothman*, 123 F.3d at 452. This Court is aware that there may be different ways to analyze a Rehabilitation Act claim depending on whether a defendant acknowledges relying upon the plaintiff's disability. *See, e.g., Carter v. Casa Central*, 849 F.2d 1048, 1052 n. 4 (7th Cir.1988) (stating that, on appeal, the plaintiff had not challenged the district court's use of the *McDonnell Douglas* test, but noting that the Tenth Circuit rejects disparate treatment analysis for Rehabilitation Act claims and that the Second Circuit distinguishes suits in which "defendant acknowledges relying on plaintiff's handicap from those in which defendant denies reliance."). In *Rothman* the Seventh Circuit articulated this four-part prima facie test in the context of a *McDonnell Douglas* framework, notwithstanding that the defendant disavowed reliance on the plaintiff's alleged disability. *Cf. Tyler v. Runyon*, 70 F.3d 458, 467 & n. 10 (7th Cir.1995) (applying *McDonnell Douglas* framework to Rehabilitation Act claim and articulating different requirements for prima facie test). In this case, the Postal Service disclaims reliance on Plaintiff's disability in its decision to terminate Payton and Payton does not purport to have direct evidence of discrimination. Accordingly, we apply the *McDonnell Douglas* framework to Payton's Rehabilitation Act claim. Further, because we find that the Postal Service has articulated a legitimate, nondiscriminatory reason for terminating Payton, we need not decide the correct requirements for a prima facie case under the Rehabilitation Act.

ployer is entitled to make a mistake or exercise poor judgment so long as it honestly believes in reason offered for making decision). Payton does nothing to undermine Ford's testimony and create genuine issues of material fact about whether Ford actually believed Payton had threatened Ruona.

Second, and even more importantly, Ruona was not the supervisor responsible for the decision to fire Payton. That decision was made by Steve Gadson and was approved by his supervisor, Terry Moore. *See* Defendant's Ex. 15 ("Request for Action" Letter submitted by Gadson to Labor Relations stating, "[b]ased on the findings in the Investigative Memorandum [written by Postal Inspector Sheehan] on the actions of Mr. Payton and the serious nature of the charges, I request appropriate disciplinary action."); Defendant's Ex. 16 (Gadson Memorandum (approved by his supervisor Terry Moore) to Payton notifying him that he was being placed on off-duty status because of threats made in his telephone call with Eunice Ford and the permanent protective order issued by the Marion County Municipal Court); Defendant's Ex. 17 (Gadson Memorandum (approved by supervisor Terry Moore) to Payton terminating his employment). Payton has not presented any evidence undermining the genuineness of Gadson's belief that Payton had threatened Ruona's life and, thus, has fallen considerably short of establishing that Payton was fired for any reason (let alone a discriminatory one) other than that the Postal Service believed he had threatened the life of Bill Ruona, his supervisor. *Cf. Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 397 (7th Cir.1997) (plaintiff's failure to demonstrate any connection between termination decision made by one supervisor and the opinion of a lower-level employee was fatal to his Americans with Disabilities claim); *Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1155 (7th Cir.1989) ("[A]ctions and comments by employees not involved in a discharge decision cannot provide a basis for charging other employees with discrimination.").

Payton argues that, "[e]ven assuming for the sake of argument that the Postal Service may have believed that Payton had made some 'death threat' (which he did not), absolutely no interactive process was employed to explore or otherwise objectively evaluate this supposed threat with Payton or his own treaters." Plaintiff's Response at 11. Payton ignores the fact that Gadson did, indeed, set up a meeting with Payton in order to discuss Postal Inspector Sheehan's investigation into Payton's alleged threats and that Payton chose not to attend this meeting. *See* Payton's Dep. at 182–84; Defendant's Ex. 15. Payton further ignores that he was present at the Marion County court hearing on Ruona's application for permanent protective order and, notwithstanding his arguments, the court issued permanent relief to Ruona. Payton's Dep. at 168–69; Defendant's Ex. 14.

Payton also maintains that any risk the Postal Service "may have believed existed was speculative and remote, at best" and that, before an employer may fire someone because of a risk of danger, it must "be prepared to show that the specific and identifiable risk is significant, current and ... objective in light of the circumstances." Plaintiff's Response Br. at 11. Payton apparently believes that, at the least, the Postal Service should have consulted with his "treaters"—presumably, the doctors with whom he was consulting for his mental illness—in order to evaluate whether he was, in fact, a threat to Ruona. Payton cites 29 C.F.R. § 1630.14(b) as evidence that "[a]n employer may not simply declare that an employee is a direct risk of danger to himself or others as a legitimate basis for denying or terminating employment." *See* Plaintiff's Response Br. at 11.

29 C.F.R. § 1630.14(b), entitled "Medical examinations and inquiries specifically permitted; Employment entrance examination" does not in any way support Plaintiff's position.[3] Notwithstanding Plaintiff's single, in-

---

**3.** It provides:

A covered entity may require a medical examination (and/or inquiry) after making an offer of employment to a job applicant and before the applicant begins his or her employment duties, and may condition an offer of employment on the results of such examination (and/or inquiry), if all entering employees in the same job category are subjected to such an examination (and/or inquiry) regardless of disability.

correct cite, the Court believes that Plaintiff is attempting to invoke the principles explicated in the Supreme Court decision *School Board of Nassau County v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). In *Arline,* the Supreme Court held that, in a Section 504 Rehabilitations Act, courts should consider four factors to determine if a plaintiff with a contagious disease would be "otherwise qualified" to participate in a federally funded program. Those factors include: (a) the nature of the risk; (b) the duration of the risk; (c) the severity of the risk; and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm. *Arline,* 480 U.S. at 288, 107 S.Ct. at 1131.

Unfortunately for Payton, although we think we have discerned the source of his legal argument, it nonetheless fails. In *Arline,* the Supreme Court analyzed these factors in order to determine if the plaintiff was "otherwise qualified" to participate in a federally funded program; in other words, this analysis was done in order to evaluate the plaintiff's prima facie case of discrimination. For purposes of our analysis today we have assumed that Payton was otherwise qualified for his job and have taken for granted that he can establish a prima facie case. Thus, this argument does not help Payton's Section 501 claim survive summary judgment.

Furthermore, while we can conceive of a case where an employer's proffered reason for terminating an employee might appear to be pretext because a reasonable jury could believe that the employee's alleged threats were not objectively threatening, this is not one of those cases. Payton acknowledges that the Postal Service was reasonably and genuinely concerned about threats of violence following the tragedy in Royal Oak, Michigan. Payton's Dep. at 122–23; *see also* Defendant's Ex. 9 (Postal Service memorandum advising employees of actions implemented at the national level to minimize events like the one at Royal Oak, Michigan). Eunice Ford informed Postal Inspector Sheehan that Payton told her that Ruona "deserves to be killed," that "all the guns in his home had been confiscated . . . so that he would not [either] blow away (or kill. . .) Bill

29 C.F.R. § 1630.14(b).

Ruona," and that "he would not be like the man from Royal Oak, Michigan who went into the Post Office and killed a bunch of people and then turned the gun on himself. He said he would do the killing then turn himself in and go to Central State Hospital (or Larue Carter) for a couple of years and make baskets." Defendant's Ex. 12. Bill Ruona received temporary and then permanent protection against Payton from a Marion County Court. Defendant's Exs. 13 & 14. When Steve Gadson contacted Payton to invite him to a meeting to discuss Postal Inspector's investigation into Payton's alleged threats against Ruona, Payton referred to Bill Ruona as a "dumbass" and said that Ruona had "dragged him back into court . . . and it cost him about $100.00." In addition, Payton told Gadson that he "would like to get behind the U.S.P.S. and do some serious ass kicking." Defendant's Ex. 15. Payton also did not attend the meeting with Gadson and his Union Steward. Defendant's Ex. 15. And, of course, all of these statements and events followed Payton's unseemly and cruel remark to the media concerning the victim of the then-recent shootings at the Royal Oak post office, and provide a context and credibility to all that occurred thereafter.

Under the circumstances, the Court finds that the Postal Service's action in terminating Payton's employment was legitimate and not a pretext for disability discrimination. Accordingly, the Postal Service's motion for summary judgment on Plaintiff's Rehabilitation Act Sections 501 and 504 claims must be *granted.*

### C. *First Amendment Claim*

■ Defendant also moves for summary judgment on Payton's First Amendment claim. Payton contends that he was fired in retaliation for speaking with the media about the shootings at Royal Oak, Michigan. But he presents no evidence linking his termination with his statements to the media, let alone evidencing that his statement to the media was a motivating factor for his discharge. *See Board of County Comm'rs v. Umbehr,* ─── U.S. ───, ───, 116 S.Ct. 2342,

2352, 135 L.Ed.2d 843 (1996) ("To prevail, [plaintiff] must show that the termination of his contract was motivated by his speech on a matter of public concern, an initial showing that requires him to prove more than the mere fact that he criticized the [defendants] before they terminated him."); *O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1370 (7th Cir.1993) ("the fact that protected speech may precede an adverse employment decision does not establish causation under *Mt. Healthy.*") (discussing *Mt. Healthy City School Dist. Board of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

 Plaintiff acknowledges that he was not singled-out and told not to make further comments to the media, but was among a group of postal employees directed not to talk to the media. Payton's Dep. at 119–20. Yet Payton maintains that because the Postal Service characterizes his statement regarding the Royal Oak shooting as "bizarre," instead of acknowledging that his was the commonly held view, he simply must have been terminated in violation of the First Amendment. Whether there is an issue of fact regarding if Payton's views were widely shared or "bizarre" does not create a material issue of fact sufficient for Payton to avoid summary judgment. Payton offers nothing more than mere speculation that his statement to the media motivated his termination and, as discussed, the Postal Service has presented ample evidence that it was motivated by a legitimate reason to terminate Payton's employment, namely, his threats against Ruona. *cf.*, *Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir.1992) (stating that, if plaintiff presents evidence that protected speech was a motivating factor for adverse employment action, employer has opportunity to present evidence that it would have terminated the employee even absent the impermissible considerations). Accordingly, the Postal Service's motion for summary judgment is *granted* as to Payton's First Amendment claim .[4]

## D. *Indiana Public Policy Claim*

Defendant also moves for summary judgment on Plaintiff's claim that his termination was in violation of Indiana public policy. Unfortunately, Plaintiff comes forward with no more evidence in support of this claim than he did on his others, and he does not make even a pretense of addressing the Postal Service's arguments that his state law claims are foreclosed by the Federal Torts Claim Act (which requires an administrative claim to be filed, of which there is no evidence), that Indiana law does not recognize a retaliatory discharge claim under the circumstances presented in this case (*see, e.g., Martin v. Platt*, 179 Ind.App. 688, 386 N.E.2d 1026 (1979); *Campbell v. Eli Lilly & Co.*, 413 N.E.2d 1054 (Ind.App.1980)), and that, to the extent Payton is stating a First Amendment Claim pursuant to the Indiana State Constitution, he has failed to demonstrate that his

---

4. The Postal Service argues that Payton participated in civil service grievance proceedings prior to pursuing his federal claim and that the grievance system provides an adequate remedy for federal employees. Defendant's Br. at 21. It is true that when Congress has provided an adequate remedy as an alternative to a common-law remedy, a plaintiff may not recover directly under the Constitution for a violation of his First Amendment rights. *See Ellis v. United States Postal Service*, 784 F.2d 835, 839–40 (7th Cir. 1986) (finding that Congress "expressly authorized the adoption of final and binding grievance provisions in Postal Service collective bargaining agreements ... and since the particular collective bargaining agreement between the Postal Service and the employees' union establishes a multi-step procedure which culminates in binding third-party arbitration" no remedy was available directly under the Constitution). Payton does not dispute that he participated in the federal grievance system. Nevertheless, the Court notes that the Postal Service did not present evidence regarding the particulars of the Postal Service grievance system. *Cf., Robbins v. Bentsen*, 41 F.3d 1195, 1200 (7th Cir.1994) (holding that a *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)-remedy is not available when *"defendants show* that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective.") (emphasis added). Thus, although we believe that, with additional evidence, Payton's claim would likely be barred on this ground as well, *see* 39 U.S.C. § 1206 (authorizing Postal Service collective bargaining agreements), we cannot at this time hold that the Postal Service's motion for summary judgment should be granted on this alternative ground.

---

statement to the media was a motivating factor in his termination (*see Lach v. Lake County,* 621 N.E.2d 357 (Ind.App.1993)). Accordingly, the Postal Service's motion for summary judgment is *granted* on all Payton's claims, including that he was terminated in violation of Indiana public policy.