Darryl **DANIELS**, Glen E. Dewlow, Joseph Fitzner, Thomas Henry, Jesus Ortega, Anthony O'Donnel, John Cotton, Sherman Willis, Fred Gordon, William Fitzpatrick, Jeffrey Mikols, Frank Loverde, Lawrence Saulsberry and Sherwin T. Boston, **Plaintiffs,**

v.

Michael F. **SHEAHAN,** in His Individual Capacity and as the Sheriff of Cook County, Illinois, and the Sheriff of Cook County, Illinois **Defendants.**

No. 97 C 5430.

United States District Court, N.D. Illinois, Eastern Division.

April 5, 2000.

Matthew Marzano Litvak, Chicago, IL, for plaintiffs.

Regina Worley Calabro, Letitia Dominici, Cook County State's Atty., Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

This case presents a footnote in the storied history of politics and corruption in Chicago. In 1990, Michael Sheahan, a Democrat, won an election and became the Sheriff of Cook County. Shortly thereafter, the FBI came knocking on his door.

The agents asked for his cooperation in their investigation of corruption in the administration of his predecessor, James O'Grady, a Republican. Sheahan agreed and starting in the fall of 1993 a tale of "endemic corruption" in the hiring practices of the Sheriff's Office unfolded in the courts and the media.[1] False test results, forgery, bribery and ghost-payrolls made it into indictments and headlines. Plaintiffs in this case were on a list of sheriff's employees suspected of somehow participating in or perhaps merely benefitting from the corruption. Sheahan de-deputized them and initiated administrative proceedings against them. In the end, after significant wrangling before the Merit Board and in the state courts, Sheahan withdrew the complaints against the plaintiffs and re-deputized them. Plaintiffs believe Sheahan violated their First Amendment rights; Sheahan punished them, they say, merely because he thought they were Republican donors. Sheahan moves for summary judgment.[2]

The parties agree on the facts.[3] The Cook County Merit Board is a statutory entity responsible for overseeing the hiring and promotional criteria for the Cook County Sheriff's Office. The Board administers examinations and certifies the eligibility of employees. The FBI suspected that the Merit Board, during the O'Grady administration, gave passing grades to people who had actually flunked the tests. The FBI asked the Sheahan administration for access to the Merit Board files and inspected them. Over three hundred names were put on a list, people who apparently flunked the exam but received passing grades anyway. The Merit Board reviewed the FBI's list and forwarded a list of three hundred names to the Sheriff's

---

1. "Endemic corruption" is the term used by the then-United States Attorney in a press release from September, 1993.

2. Summary judgment is appropriate if, evaluating the admissible evidence in the light most favorable to the plaintiffs, there is no genuine issue of material fact and Sheahan is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

3. The facts as I describe them are taken from defendants' Local Rule 56 statement of facts. Plaintiffs admit all but one of defendants' facts. There is a dispute as to the interpretation of certain statements made in the press, which I discuss *infra.*

Office. Sheahan's top aides decided to take the first thirty individuals, based on seniority, and prosecute them in front of the Merit Board for not being qualified for their positions. Plaintiffs were among the first thirty and Sheahan signed the complaints against them.

Of course, the FBI was not investigating poor grading skills within the Merit Board, but corruption. The federal indictments and plea agreements reveal a scheme where bribes could be paid in the form of donations to O'Grady's campaign fund. In return, passing grades would be given, regardless of the actual test scores. According to one press account, some individuals paid $2,000 to $6,000 each in political contributions in return for passing grades and false educational certificates. O'Grady's undersheriff, James Dvorak, pleaded guilty to falsifying the test results of at least 367 politically connected applicants.

This atmosphere of corruption, as it played out in the press throughout 1994 and 1995, is merely the backdrop to the specific facts concerning these plaintiffs. Here, the facts are simple and undisputed. The plaintiffs' names were on the list of three hundred applicants who may have failed the test but received passing grades. Plaintiffs admit that they in fact flunked the tests. In August, 1994, Sheahan filed complaints against them before the Merit Board. The complaints were dismissed for failing to allege any knowing fraud on the plaintiffs' part, and in August, 1995, Sheahan signed amended complaints, arguing only that plaintiffs did not pass the exam so their appointments should be voided. The amended complaints do not allege any fraud on the part of plaintiffs or that plaintiffs were Republican donors. Sheahan voluntarily withdrew the amended complaints in 1998 and re-deputized the plaintiffs.[4]

On the record before me, there is no evidence that the plaintiffs bribed anyone. They were not the defendants in any federal charges and they are not identified in the media coverage submitted to me. There is no evidence that the plaintiffs made even innocent donations to O'Grady's campaign, and in fact, they claim they had no affiliation with any political party between 1985 and the present. I also note that there is no evidence that plaintiffs refused to contribute to Sheahan's campaign or that Sheahan targeted them because they did not support him. Plaintiffs agree that they have no proof of Sheahan endorsing donations to the Democrats as a *quid pro quo* for false test scores or any other favorable treatment. The only evidence that concerns these specific plaintiffs is that they did not pass the test and Sheahan signed amended complaints against them.[5] But, they say, the atmosphere of political corruption brings the First Amendment into play.

█ Plaintiffs argue that Sheahan's amended complaints were politically motivated. In order to show a violation of their First Amendment rights, plaintiffs must prove that their conduct was constitutionally protected and that the protected conduct was a substantial factor in the decision to de-deputize them.[6] *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). I have

4. The record provides no details as to why Sheahan dropped the complaints. However, it appears as though the Merit Board did not believe the failure to pass the test made the plaintiffs' certification void *ab initio* and Sheahan had neither the proof nor the resources to seek the termination of plaintiffs for cause. *See Sheahan v. Bianchi,* 296 Ill. App.3d 310, 230 Ill.Dec. 864, 695 N.E.2d 73 (1st Dist.1998).

5. The parties previously agreed that the statute of limitations has run on any claims aris-

ing from the filing of the first complaints. *See Daniels v. Sheahan,* 1997 WL 786649 (N.D.Ill. 1997).

6. To be individually liable under 42 U.S.C. § 1983, Sheahan must have personally participated in the constitutional deprivation. Although he delegated much of the work to subordinates, Sheahan had the authority to seek de-deputization and personally signed the amended complaints. This is sufficient participation to impose individual liability. Sheahan does not dispute this.

combed through the parties' Local Rule 56 statements of material facts and I find no evidence that these plaintiffs made any political contributions to O'Grady or the Republican Party. The first element of the cause of action is proof of protected activity, but here, there is no proof. Indeed, plaintiffs say they had no political affiliation. Plaintiffs' Answers to Defendants' Interrogatories, No. 13.

■ Instead, plaintiffs say that Sheahan *believed* they were Republican donors and he was motivated by this belief to de-deputize them. But Sheahan does not know the plaintiffs personally and has no knowledge of their political affiliations. Plaintiffs' only evidence of Sheahan's belief comes from general statements made by journalists. One newspaper article, from August 25, 1994, noted that individuals gave $2,000 to $6,000 in return for passing grades and that seven high-ranking officials pleaded guilty in federal court to fixing test results for at least 455 politically connected applicants. These statements are not attributed to Sheahan or his staff. Therefore, they are not proof of Sheahan's beliefs. In a television news report, submitted as a videotape exhibit by plaintiffs, the commentator is heard to say, "The Sheriff says, 'Officers got hired through a jobs for campaign money scheme under former Sheriff James O'Grady. All a campaign supporter had to do was donate money and, qualified or not, he could get a job.' " [7] Sheahan objects to this statement and moves to strike it. As it stands in the record here, it is a statement by an unidentified commentator that purports to contain a statement by Sheahan. There is no foundation to admit it and I strike it.

Sheahan admits to saying, "What we are talking about here is the unraveling of one of the most complex corruption schemes ever brought to light in this country." One aspect of this conspiracy clearly was a jobs-for-money bribery scheme. I can reasonably infer that Sheahan believed someone was paying bribes and it would be reasonable to infer that Sheahan believed that those individuals on the FBI list either paid bribes or unwittingly benefitted from the corrupt atmosphere.[8] Dvorak's guilty plea suggests these individuals may have been "politically connected." But this is the most that one can attribute to Sheahan's mental state. While politics and corruption go hand in hand on occasion, only the first is protected by the First Amendment.

■ Even in Chicago, making a political contribution in exchange for false test scores is not protected activity. While I appreciate plaintiffs' citation to *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), there is no evidence that Sheahan believed that legitimate political contributions were made here. I reject the argument of plaintiffs that since the Sheriff's Office did not or could not prove that plaintiffs were involved in corruption, he must have been solely motivated by a belief that they were Republican donors. Plaintiffs introduce no evidence to support this quasi-pretext theory. Every public statement by Sheahan or his spokesperson speaks to corruption, not political vengeance.

■ Protected conduct was not the motivating factor in Sheahan's decision to proceed against the plaintiffs. Therefore, plaintiffs cannot meet their burden to prove a First Amendment violation and defendants are entitled to summary judgment.[9]

---

7. Based on my review of the tape, it is not clear whether the second sentence is meant to be attributed to the Sheriff. The parties assume it is.

8. In 1995, Sheahan's press spokesperson was quoted as saying, "These employees failed the entry level test and should not have been hired. We're not saying it's their fault." Therefore, Sheahan may well have believed that these plaintiffs made no political contributions at all.

9. The burden to prove that protected conduct was a substantial or motivating factor is not an insignificant one. *Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir.1981). In *Garrett v. Barnes*, 961 F.2d 629, 634 (7th Cir.1992), the Seventh Circuit surveyed the case law and

Even if there were an issue of fact concerning Sheahan's desire to oust Republican donors, defendants can easily meet their burden to prove a legitimate, non-political reason to file the amended complaints. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568. The FBI and the Merit Board put together a list of individuals who failed the test but received certification. Even though Sheahan became aware of this anomaly because of an investigation into his Republican predecessor, once he learned of it, he had a legitimate, non-political reason to pursue administrative remedies. The parties agree that a public danger existed as a result of the O'Grady administration's certification of failed test-takers. Whether or not Sheahan believed the plaintiffs were "politically connected," they were on the list. Plaintiffs can point to no evidence that suggests that the compilation of the list was politically biased. Since Sheahan had no proof of deliberate misconduct by the plaintiffs, the only means to cure the perceived public danger was to seek relief from the Merit Board. *See Vanko v. Sheahan*, 278 Ill.App.3d 302, 303, 214 Ill.Dec. 946, 662 N.E.2d 512, 514 (1st Dist.1996) (Sheriff can void certification without going to Merit Board only under limited circumstances). This was both legitimate and non-political. For this alternative reason, defendants are entitled to summary judgment.[10]

## CONCLUSION

In some ways, plaintiffs' arguments confuse political corruption with politics as usual. Perhaps this is understandable given Chicago's history on the issue. However, absent evidence of legitimate political expression, there is no Constitutional viola-

tion. Defendants' motion for summary judgment is granted.

---

noted "the least amount of evidence to survive a summary judgment motion was in the case of *Rateree v. Rockett*, 670 F.Supp. 787 (N.D.Ill.1987)." In *Rateree*, the plaintiffs were the specific target of a remark that indicated "displeasure with their support for the mayor." *Garrett*, 961 F.2d at 634. Plaintiffs'

support of Republicans, which they deny ever occurred anyway, was not the target of displeasure here; the target was the corruption.

**10.** Since defendants win on the merits, I decline to rule on Sheahan's qualified immunity argument.